IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

GREGORY McHENRY,                    )
                                    )
              Plaintiff,            )
                                    )
    v.                              )    No.  05 C 3119
                                    )
JO ANNE B. BARNHART,                )
Commissioner of Social Security,    )
                                    )
              Defendant.            )

## MEMORANDUM OPINION AND ORDER

Gregory McHenry ("McHenry") seeks judicial review of a final

decision of Commissioner of Social Security Jo Anne Barnhart

("Commissioner") that denied McHenry's application for Title XVI

Supplemental Security Income ("SSI") under the Social Security

Act ("Act"), 42 U.S.C. §423(d).[1]  Both sides have moved for

summary judgment under Fed. R. Civ. P. ("Rule") 56, with McHenry

having moved alternatively to remand for further proceedings.

For the reasons stated in this memorandum opinion and order, both

parties' Rule 56 motions are denied, while McHenry's alternative

motion to remand is granted.

## Procedural Background[2]

McHenry filed an application for SSI benefits on June 17,

---

[1] All statutory references will take the form "Section--,"
using the Title 42 numbering rather than the Act's internal
numbering.  All 20 C.F.R. provisions will be cited "Reg. §--."
Finally, McHenry's memorandum will be cited "M. Mem.--."

[2] What follows as to both procedure and factual substance is
drawn from the administrative record (cited "R.--").

2002, initially asserting an onset date of January 1, 1983 (R. 71-73).[3] On July 12, 2002 his application was initially denied, and on December 3, 2002 it was again denied upon reconsideration (R. 25-28, 33-36). After having filed a timely request for hearing, on November 16, 2004 McHenry--represented by attorney Augustus Garcia--appeared before ALJ B. Carlton Bailey for that purpose. McHenry, medical expert Dr. Ashok Jilhewar and vocational expert Richard Hamersma ("Hamersma") testified at the Hearing (R. 212-40). ALJ Bailey's March 25, 2005 decision (R. 15-21) concluded that McHenry was not disabled, finding specifically that if McHenry complied with his prescribed treatment his medically determinable impairments would not prevent him from performing substantial gainful activity.

On April 11, 2005 McHenry filed a request for review with the Appeals Council (R. 10-11). After reviewing the ALJ's decision, the Appeals Council denied that request on May 13, 2005 (R. 7-9). On August 24, 2005 McHenry filed a timely complaint for judicial review.

### Factual Background

Born on September 13, 1966, McHenry was 38 years old at the time of the ALJ's decision. McHenry has no past relevant work

---

[3] McHenry moved to amend the onset date to June 17, 2002 at his November 16, 2004 hearing ("Hearing") before the Administrative Law Judge ("ALJ"). That motion was granted (R. 212-13).

2

experience (R. 22, 219). From December 8, 2000 to June 4, 2002 McHenry was in state custody after having been convicted of two drug offenses (R. 74-75).

McHenry's initial application for SSI asserted that his epilepsy prevented him from ever working (R. 83-84). Additionally, upon denial of his reconsideration and in conjunction with his request for an ALJ hearing, McHenry stated that he also had hypertension (R. 111-12).

Evidence documenting McHenry's medical impairments that was submitted for the ALJ's consideration covered a wide range. It included an Epilepsy Report from one of McHenry's treating physicians (a Dr. Delphin), seizure reports from McHenry's friends, notes from McHenry's treating neurologist Dr. Yevgenyaa Kaydanova, medical reports from the Illinois Department of Corrections and a residual functional capacity ("RFC") assessment performed by Dr. T. Arjmand.

Dr. Delphin's Epilepsy Report said that McHenry had three seizures per month, that those seizures were "Major Motor Seizures" and that in a typical seizure McHenry loses consciousness, has tonic/clonic movements and incontinence (R. 207).[4] That characterization largely accords with descriptions provided by McHenry's three friends in seizure reports prepared

---

[4] Because Dr. Delphin never witnessed McHenry having a seizure (R. 207), his description was based solely on McHenry's statements.

3

for the Bureau of Disability: All three described McHenry as losing consciousness and biting his tongue during seizures (R. 104-06). Two of McHenry's friends claimed that McHenry had seizures more than once a month, while one said McHenry had more than one seizure per week (id.). None, however, described McHenry as losing bladder or bowel control during his seizures (id.).

In addition McHenry submitted medical records from Dr. Kaydanova, who saw him on several occasions before and after his incarceration. In a March 23, 1999 "Neurology Note" Dr. Kaydanova diagnosed McHenry as having complex partial seizures (R. 191). Dr. Kaydanova there said the seizures were not controlled by McHenry's prescribed medication, Tegretol, most likely because of McHenry's poor compliance with the requirements of that medication (id.). On a number of dates--June 15, 1999, September 24, 2002, December 3, 2002, March 4, 2003 and April 8, 2003--Dr. Kaydanova reiterated that McHenry's seizures were not well controlled, but that McHenry admitted to missing doses and forgetting to take his medication (R. 191, 192, 194-95, 197-98, 200-01, 203-04). In each of her notes Dr. Kaydanova said that McHenry reported having at least three seizures per month (R. 192, 194, 197, 200, 203). During McHenry's December 3, 2002 visit Dr. Kaydanova sought to provide better control of his seizures by increasing his dosage of Tegretol by 200 mg a day and

4

switching to an extended release form of the medication (R. 199).
According to Dr. Kaydanova's notes from McHenry's April 8, 2003
visit, however, due to insurance issues McHenry was unable to
switch to "Tegretol-XR," and "[d]ue to the same problem [Dr.
Kaydanova was] unable to add a second medication for the
management of [McHenry's] seizures" (R. 203).

McHenry also submitted for consideration medical progress
notes from the Seizure Clinic in the Illinois Department of
Corrections. Those notes differ somewhat from those provided by
Dr. Kaydanova: Although in the early part of 2001 McHenry
displayed very low Tegretol levels, suggesting noncompliance, by
the end of that year medical records indicated that McHenry's
Tegretol level of 8.7 was therapeutic. McHenry reported on April
8, 2002 that he had not had a seizure since October 2001 (R.
162).

Finally, Dr. Arjmand's RFC dated July 8, 2002 was also
submitted for the ALJ's consideration. Dr. Arjmand found that
McHenry had no exertional, manipulative, visual or communicative
limitations (R. 178-80). Dr. Arjmand opined that McHenry should
only occasionally climb ladders and work around ropes and should
avoid concentrated exposure to hazards such as machinery and
heights (R. 178, 180).

At the Hearing ALJ Bailey took testimony from McHenry,
medical expert Dr. Jilhewar and vocational expert Hamersma.

5

McHenry testified that his seizures began when he was hit on the head with a hammer when he was 17 or 18 (R. 222-23). McHenry stated that during his seizures he blacks out, his tongue causes him to gag and he sometimes urinates on himself (R. 228). McHenry further stated that the number of seizures he has per month varies with the dosage of medication he is taking (R. 229). When asked how many seizures he had in May 2004, McHenry responded, "Maybe two, six maybe, something like that" (R. 228). McHenry testified that to ameliorate his seizures he takes Tegretol three times a day (R. 224). In addition to his seizures, McHenry testified that he suffers from hypertension, which is controlled by medication (R. 223). McHenry described his typical day, which primarily involves watching television or spending time with his sons, sometimes includes chores and infrequently includes transportation and exercise, both of which are problematic for him (R. 221-22). Finally, McHenry described his problems with memory and concentration (R. 223, 226).

Following McHenry's testimony, Dr. Jilhewar explained to the ALJ that he could not evaluate McHenry's claim because there were no Tegretol levels recorded after September 24, 2002. It was thus impossible to determine whether McHenry was having seizures despite compliance with his prescribed treatment or because he was noncompliant with such treatment. Dr. Jilhewar said that he was skeptical that McHenry was compliant with his medication

6

requirements, because the medical records from the Illinois
Department of Corrections reflected that when McHenry was
incarcerated he was given 400 mg of Tegretol twice a day and had
no seizures between October 2001 and April 2002 (id.). In
addition Dr. Jilhewar wanted further medical evidence to
determine whether McHenry's seizures were grand mal seizures
under Listing 11.02 or petit mal seizures under Listing 11.03 (R.
233-35). ALJ Bailey then directed McHenry's attorney to obtain
further medical documentation of (1) McHenry's compliance with
prescribed treatment and (2) the nature of his seizures (R. 235-
36).

Although the ALJ had implied that such requested further
evidence would be dispositive, "out of an abundance of caution"
the ALJ took testimony from Hamersma (R. 236). In questioning
Hamersma, ALJ Bailey asked him to assume a hypothetical
individual of the "same age, education and work experience [as]
the Claimant" and with the following RFC: "no exertional
limitations, but has these environmental limitations...no
climbing of ropes, ladders and scaffolds. No unprotected
heights, no being around moving machinery, and no commercial
driving..." (R. 237). According to Hamersma, a person with those
limitations could work as a cashier, office cleaner or hand-
packager, all of which were abundantly available in the Chicago
metropolitan area (R. 238).

7

After the close of the Hearing, in response to the ALJ's
request McHenry submitted further documentation of his seizure
disorder: a flow sheet of his Tegretol levels, an Epilepsy
Report by Dr. Kaydanova and two Neurology Notes (R. 114-25). In
a cover letter directed to the ALJ, McHenry's attorney stated
that the enclosed documentation "indicates that the claimant has
a listed impairment within the meaning of Section 11.02 Epilepsy"
(R. 114). In her Epilepsy Report Dr. Kaydanova said that McHenry
took his medicine as prescribed (R. 115) and diagnosed him as
having complex partial epilepsy, noting that "patient states that
he has loss of consciousness and...possible motor activity but
[the seizures were] not witnessed by physician" (id.). Dr.
Kaydanova stated that McHenry's condition did not limit his
ability to do work-related activities, although she added a
caveat that McHenry "should not drive, operate moving machinery
or work [at] high altitude[s]" (id.).

In contrast to the Epilepsy Report, Dr. Kaydanova's
Neurology Notes from June 16, 2004 and November 16, 2004 indicate
that McHenry was not taking his medication as prescribed (R.
123). On June 16, 2004 Dr. Kaydanova wrote that instead of
taking one Tegretol XR 300 mg tablet per day, McHenry was taking
one Tegretol XR 100 mg tablet plus one tablet of Carbamazepine
100 mg per day (R. 122). Although as Dr. Kaydanova indicated the
frequency of seizures had lessened since McHenry's last visit,

8

his seizure disorder was "not under control" (R. 124). Dr. Kaydanova advised McHenry to take three Tegretol 100 mg XR tablets per day. On November 16, 2004, however, Dr. Kaydanova noted that McHenry could not afford the cost of the extended form of Tegretol "and is taking regular Tegretol twice a day" (R. 121).

## ALJ Determination

ALJ Bailey reviewed the submitted evidence and made a series of findings adverse to McHenry's claim (R. 20):

1. While McHenry's seizure disorder and hypertension were severe, they "do not meet or medically equal one of the listed impairments."

2. "Provided claimant follows prescribed medical treatment, the claimant has the following residual functional capacity: to perform a full range of heavy work, with the restrictions that he must never engage in climbing ladders, or working with ropes or scaffolds, and with the environmental restrictions that he must avoid working at heights or with moving machinery, and must not do commercial driving."

3. "When claimant is compliant with prescribed treatment...there are a significant number of jobs in the national economy that he could perform."

4. McHenry is "not compliant" with prescribed medical treatment.

As a result of those findings the ALJ held that McHenry was not under a disability and thereby not entitled to SSI (id.)

## Standard of Review

Judicial review of any decision by Commissioner, as authorized by Section 405(g), requires that findings of fact must

9

be upheld if they are supported by substantial evidence. Such review is therefore limited to determining (1) whether Commissioner applied the correct legal standards in reaching the decision and (2) whether there is substantial evidence in the record to support the findings (Rice v. Barnhart, 384 F.3d 363, 368-69 (7th Cir. 2004)). Substantial evidence means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion" (Kepple v. Massanari, 268 F.3d 513, 516 (7th Cir. 2001), quoting Richardson v. Perales, 402 U.S. 389, 401 (1971)). In reviewing Commissioner's determination, this Court must look at the entire administrative record, but it may not reweigh the evidence, resolve conflicts, decide credibility questions or substitute its own judgment for Commissioner's (Clifford v. Apfel, 227 F.3d 863, 869 (7th Cir. 2000)). That does not however call for an uncritical rubber-stamping of Commissioner's decision (id.).

To be eligible for benefits, McHenry must suffer from a "disability," defined in pertinent part as (Section 423(d)(1)(A)):

> inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.

Knight v. Chater, 55 F.3d 309, 313 (7th Cir. 1995) sets out the familiar five-step inquiry prescribed by Reg. §416.920 to

determine whether a claimant is disabled:

1.    whether the claimant is currently employed;
2.    whether the claimant has a severe impairment;
3.    whether the claimant's impairment meets or equals one
      of the impairments listed by the SSA, see 20 C.F.R.
      §404 Subpt. P, App. 1;
4.    whether the claimant can perform h[is] past work; and
5.    whether the claimant is capable of performing work in
      the national economy.

If a claimant satisfies steps one, two, and three, []he will
automatically be found disabled. If a claimant satisfies
steps one and two, but not three, then []he must satisfy
step four. Once step four is satisfied, the burden shifts
to the SSA to establish that the claimant is capable of
performing work in the national economy.

## Failure To Follow Prescribed Treatment

McHenry contends that the ALJ erred by failing to follow

Social Security Ruling ("SSR") 82-59 (1982 WL 31384) when he

found McHenry to be noncompliant. McHenry also claims that the

ALJ's determination that McHenry did not have justifiable cause

for failing to follow his anticonvulsant therapy was not based on

substantial evidence. Because the ALJ did not in fact afford

McHenry the full procedural protections prescribed by SSR 82-59,

nor did he properly support his finding that McHenry lacked good

cause for his noncompliance, a remand is called for.

Noncompliance with prescribed medical treatment factors into

the disability calculus for epilepsy in two respects. First, to

be found to meet Listing 11.02 ("Epilepsy-Convulsive") or Listing

11.03 ("Epilepsy-Nonconvulsive") a claimant must suffer from a

certain type and frequency of seizures "in spite of at least 3

11

months of prescribed treatment." Second, according to SSR 87-6 (1987 WL 109184, at *4), which governs epilepsy cases, if the impairment does not meet or equal either Listing 11.02 or 11.03 but "the individual is found to be disabled [at step five], the issue of failure to follow prescribed treatment must be addressed." Where that occurs SSR 87-6 then directs the ALJ to consider noncompliance pursuant to SSR 82-59.[5] That second layer of noncompliance analysis, performed pursuant to SSR 82-59, may differ in one important respect from the earlier analysis of noncompliance under Listings 11.02 and 11.03: While neither Listing 11.02 nor Listing 11.03 makes any allowance for justifiable cause for failing to follow prescribed treatment, SSR 82-59 and the regulations it implements do so expressly (see SSR 82-59, at *3-4 and Reg. §416.930(c)).

To be sure, ALJ Bailey never explicitly found McHenry disabled. But because the ALJ "premise[d] the denial of benefits solely on [McHenry's] failure to follow prescribed treatment," it is appropriate to apply SSR 82-59 (Roberts v. Shalala, 66 F.3d 179, 183 (9th Cir. 1995)). ALJ Bailey's opinion said "[t]his

---

[5] By its terms SSR 82-59 applies only to individuals with a "disabling impairment." Under Reg. §404.1511 a disabling impairment is "an impairment (or combination of impairments) which, of itself, is so severe that it meets or equals a set of criteria in the Listing of Impairments...or which, when considered with your age, education and work experience, would result in a finding that you are disabled under §404.1594." As already noted, in epilepsy cases SSR 87-6 allows the ALJ to apply SSR 82-59 if the individual is found disabled at step five.

case will turn on whether the claimant has been taking his medications and the therapeutic level" (R. 17). After finding that McHenry did not meet Listing 11.02 because of his failure to follow prescribed treatment, ALJ Bailey incorporated his finding of noncompliance into his analysis of McHenry's RFC and job opportunities. ALJ Bailey conditionally accepted Arjmand's RFC "provided claimant is compliant with taking his medications" (R. 18). Additionally the ALJ found that "if the claimant were compliant with following prescribed medical treatment, the claimant retains the capacity for work that exists in significant numbers in the national economy" (id.). Citing Reg. §416.930 and SSR 82-59 as the basis for denying benefits, ALJ Bailey concluded that McHenry "is not under a 'disability' as defined in the Social Security Act..." (R. 18-19). With SSR 82-59 thus brought into play, it becomes relevant to look at the standards it imposes.

While the claimant usually has the primary responsibility to produce medical evidence as to the severity of his impairments (Flener ex. rel. Flener v. Barnhart, 361 F.3d 442, 448 (7th Cir. 2004)(per curiam)), SSR 82-59 affords certain procedural protections to the claimant before social security benefits can be denied on the basis of his noncompliance with prescribed

treatment.[6]  In particular, SSR 82-59 requires (1) contact with
the treating physician to clarify the treatment, (2) notification
to the claimant of a possible denial on the basis of
noncompliance without justifiable cause and (3) an opportunity
for the claimant to explain why he failed to follow the treatment
(1982 WL 31384, at *2-3, 5).[7]  As the ensuing discussion
reflects, while the ALJ satisfied the first of those requirements
by supplementing the record with documentation from Dr.
Kaydanova, the ALJ did not conform to either of the last two.

As for the first mandate under SSR 82-59, ALJ Bailey did
direct McHenry's counsel to obtain additional records from Dr.
Kaydanova.  Dr. Kaydanova's notes provided evidence of McHenry's
prescribed treatment and compliance with that treatment, as well

---

[6] SSR 82-59 (1982 WL 31384, at *5) explains why such
protections are critical:

> In many cases, an adverse determination on this basis
> will mean that the individual will not later be able to
> meet the requirements for entitlement even if he or she
> has undergone or proposes to undergo treatment.  This
> is because at the time when the individual agrees to
> follow prescribed treatment, such requirements as
> duration or insured status may no longer be met.

[7] In addition, SSR 82-59 (1982 WL 31384, at *2) and Reg.
§416.930(a) require that the treatment have the capacity to
restore the claimant's ability to work in order to premise a
denial of benefits on a claimant's noncompliance.  In this
instance neither party is objecting to the ALJ's finding--based
largely on the fact that between October 2001 and April 2002,
while McHenry was incarcerated, he took 400 mg daily of Tegretol
and suffered no seizures--that if McHenry were compliant he could
pursue gainful activity.  Therefore this opinion does not address
that issue.

14

as offering (though not requested) evidence of the reasons, where applicable, for McHenry's noncompliance.

But as to the second SSR 82-59 directive, the ALJ never explained to McHenry that he could be denied benefits not simply because he was found noncompliant at step three, but because he was determined to be noncompliant without justifiable cause at step five. During the Hearing Dr. Jilhewar stated that he could not decide whether McHenry met either Listing 11.02 or 11.03 because he could not determine whether McHenry's "seizures are occurring because he is not compliant, or they're occurring whether [he is] compliant" (R. 233). To learn whether McHenry was following his anticonvulsant therapy, Dr. Jilhewar requested documentation of McHenry's anticonvulsant blood levels after September 24, 2002 and explained that "[i]f the levels were therapeutic, subsequent to 4/9/2003, then he meets the listing of 11.02" (R. 213, 232-34). Neither Dr. Jilhewar nor the ALJ made mention of the importance of showing justifiable cause if McHenry were found noncompliant. Although McHenry was placed on some degree of notice, then, it was only of the need to show his compliance with "at least three months prescribed treatment" as part of the step three evaluation.

Finally as to the third SSR 82-59 factor, and perhaps unsurprisingly, the ALJ never afforded McHenry an opportunity to explain whether he had justifiable cause for failing to follow

his prescribed treatment.[8]  During the Hearing the ALJ asked
McHenry only one question as to compliance:  whether he "take[s
Tegretol] regularly" (R. 224).  McHenry responded "Um-hum" and
that he is supposed to take Tegretol "[t]hree times a day" (id.).
ALJ Bailey did not ask McHenry about whether his failure to take
the oft-prescribed, and preferred, extended-release form of
Tegretol was because of his inability to pay for the medicine--
despite evidence suggesting as much, despite Dr. Jilhewar's
briefly commenting on that issue in the Hearing and despite the
ALJ's ruling on it in his opinion (R. 17, 200, 203, 232).

Of course the ALJ's request for further documentation from
Dr. Kaydanova did open up an opportunity for McHenry to
supplement the record as well--but McHenry can scarcely be
faulted for not doing so where the ALJ requested information only
from the treating physician and only on the nature of the
seizures and on whether McHenry was compliant with his
medication.  Even so, the supplemental material included medical
records that imply that McHenry was--at least in part--not taking

---

[8] According to SSR 82-59 (1982 WL 31384, at *2):

The claimant or beneficiary should be given an
opportunity to express the specific reason(s) for not
following the prescribed treatment.  Detailed
questioning may be needed to identify and clarify the
essential factors of refusal.  The record must reflect
as clearly and accurately as possible the claimant's or
beneficiary's reason(s) for failing to follow
prescribed treatment.

16

the prescribed medication because he could not afford it.[9]  For

example, Dr. Kaydanova prescribed the extended-release form of

Tegretol for McHenry on June 16, 2004 (R. 118).  Then on November

16, 2004, in the next medical note in the record, Dr. Kaydanova

stated that "[t]he formulation of Tegretol was switched to

extended form but patient could not afford its cost and is taking

regular Tegretol twice a day" (R. 121).  Earlier records confirm

that as well.  On December 3, 2002 McHenry was switched to the

extended-release form of Tegretol (R. 199).  But on March 4,

2003, in the next medical record provided, Kaydanova wrote that

McHenry "was not able to change CBZ to Tegretol XR and increase

his dose, because of insurance issue" (R. 200).

Given that information and the protections enshrined in SSR

82-59, the ALJ should have probed McHenry further about whether

he could afford his prescribed medication, for an inability to

afford medical treatment amounts to justifiable cause under SSR

82-59 (1982 WL 31384, at *4).  Instead of doing so, ALJ Bailey

merely stated in his opinion: "[McHenry] alleged that he cannot

afford time-release medicine, but the undersigned notes that Cook

---

[9] Commissioner argues that this Court should be concerned
with McHenry's failure to take the "regular" Tegretol rather
than, as prescribed, the extended-release Tegretol.  But as the
record indicates, the issue is not whether McHenry took the
"regular" or extended-release Tegretol, but rather whether he
took his medication--be it extended or regular--as prescribed by
his treating physicians.  Notably, McHenry was prescribed the
extended release form of Tegretol on multiple occasions (R. 118,
199).

17

County will give free medication" (R. 17). Yet that statement is wholly unsupported by the administrative record. There is no reference to free medical aid in the record, let alone any evidence attesting to the nature and scope of the aid that would be available to McHenry in Cook County (see Woolridge v. Barnhart, No. 03-105, 2004 WL 2075440 (N.D. Ill. Aug. 30)). Indeed, as McHenry points out at M. Mem. 5, the ALJ's conclusion is belied by Dr. Kaydanova's repeated statements that McHenry lacked insurance to purchase the preferred time release medication.

In sum, remand is warranted here because the ALJ's determination that there was no justifiable cause for McHenry's failure to follow prescribed treatment was not supported by the SSR-82-59-required substantial evidence. Because remand is called for, this opinion goes on to consider another contention advanced by McHenry that might otherwise be raised on remand.

## Nonissues on Remand

In addition to the just-discussed issue, McHenry argues the ALJ failed to consider Dr. Kaydanova's Epilepsy Report, Dr. Delphin's Epilepsy Report and McHenry's friends' seizure reports. M. Mem. 5 also claims that the ALJ's RFC determination was improperly based on a "State Agency RFC that predates treatment notes, diagnostic tests and opinions from Mr. McHenry's primary care physician and neurologist." None of those contentions has

18

merit.

As to Dr. Kaydanova's Epilepsy Report, a treating physician's opinion as to the nature of a medical condition is entitled to controlling weight only "if it is well supported by medical findings and not inconsistent with other substantial evidence in the record" (Clifford, 227 F.3d at 870). Here the ALJ's opinion explicitly discussed Dr. Kaydanova's Report in his opinion but then discredited it.[10] Evaluating the evidence, ALJ Bailey stated "Dr. Kaydanova, claimant's treating physician, reported on November 23, 2004, that claimant takes his medicine as prescribed" (R. 18). But because of the substantial evidence contradicting Dr. Kaydanova's Report--McHenry's Tegretol levels and Dr. Kaydanova's own treatment notes that confirmed McHenry's failure to comply with his prescribed medication--the ALJ permissibly declined to follow it (id.).

Next McHenry also contends that ALJ Bailey ignored Dr. Delphin's Report and McHenry's friends' seizure reports. In that respect Diaz v. Chater, 55 F.3d 300, 307-08 (7th Cir. 1995) teaches:

[A]n ALJ need not provide a complete written evaluation of every piece of testimony and evidence.

Instead the ALJ "must articulate, at some minimum level, his analysis of the evidence to allow the appellate court to trace

---

[10] Such credibility determinations are for the ALJ, and not for this Court, to make.

the path of his reasoning" (id. at 307).

There is a strong indication that the ALJ did consider and weigh the evidence provided in Dr. Delphin's Report as to the nature and severity of McHenry's seizures, even though he did not specifically mention the Report in his analysis. In his step three determination ALJ Bailey assessed McHenry's seizures under Listing 11.02, ultimately finding that they did not meet that Listing because of McHenry's noncompliance with his medication. Dr. Delphin's Report, as Dr. Jilhewar explained, was the only evidence in the record suggesting that McHenry's seizures met the severity requirement of Listing 11.02 and that McHenry's seizures should thus be analyzed under Listing 11.02 rather than 11.03 (R. 233). Hence for ALJ Bailey to have analyzed McHenry's claim under Listing 11.02 as he did, he must have relied on and accepted Dr. Delphin's Report.

Even were that not the case, however, there would be no error in the ALJ's failure to have discussed Dr. Delphin's Report in his opinion. McHenry's benefits were denied on the basis of his failure to follow his anticonvulsant therapy, an aspect on which that Report was silent. Thus McHenry could have suffered no harm even if the ALJ had ignored the Report (as he did not)(see, e.g., Skarbek v. Barnhart, 390 F.3d 500, 504 (7th Cir. 2004)(per curiam)).

Similarly, there was no error in the ALJ's failure to

discuss McHenry's friends' reports that also offered evidence of the nature and frequency of his seizures. While SSR 87-6 places a high value on such reports where the treating physician has not observed the seizures, much of the evidence in the friends' reports was not only repeated elsewhere but was also ultimately irrelevant to the ALJ's decision: Nowhere in the friends' reports was there any discussion of McHenry's compliance with his medication. Again the situation was one of "no harm, no foul" (again see Skarbek, 390 F.3d at 504).

Finally, McHenry claims that ALJ Bailey's RFC determination was improperly based on a State Agency RFC that predated diagnoses and notes from his treating physicians. That characterization of the ALJ's RFC determination is incorrect. Any RFC assessment must be "based on all the relevant evidence in the record" (Young v. Barnhart, 362 F.3d 995, 1001 (7th Cir. 2004)). While ALJ Bailey ultimately accepted Dr. Arjmand's RFC, he did so after specifically discussing Dr. Kaydanova's description of McHenry's work-related limitations and the evidence of McHenry's noncompliance with his medication (R. 18). Notably, Dr. Kaydanova's description matches Arjmand's RFC and the RFC affirmatively set out in the ALJ's ruling. Dr. Kaydanova, like the ALJ, found that McHenry could not perform commercial driving, operate moving machinery or work at high altitudes. Dr. Arjmand added, and ALJ Bailey concurred, that

McHenry should not climb ladders or work with scaffolds or ropes. It is thus clear that the ALJ "sufficiently connected the dots between [McHenry's] impairments...and the RFC finding" and that the RFC finding was proper (Young, 362 F.3d at 1002).

## Conclusion

ALJ Bailey's failure to follow SSR 82-59 and to support with substantial evidence his determination that McHenry had no justifiable cause for noncompliance with his prescribed treatment precludes a Rule 56 victory for Commissioner, while uncertainty about whether McHenry had justifiable cause bars McHenry from succeeding on his cross-motion for summary judgement. Hence both Rule 56 motions are denied. But for the reasons stated at length in this opinion, this Court grants McHenry's motion for remand (a "sentence four" remand under Section 405(g)) to determine whether McHenry had justifiable cause for failure to take his medication as prescribed.

Milton I. Shadur
Senior United States District Judge

Date: November 3, 2005

22